UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:24-cr-00009-JMS-MKK |
| | ) | |
| MAXIMILIANO PILIPIS, | ) | |
| | ) | |
| Defendant. | ) | |

**MAXIMILIANO PILIPIS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS COUNTS 1-5 OF THE INDICTMENT AND IN OPPOSITION
TO THE GOVERNMENT'S APPLICATION FOR A RESTRAINING ORDER**

Josh Minkler (Atty. No. 18483-49)
Kathleen L. Matsoukas (Atty. No. 31833-49)
Alyssa Hughes (Atty. No. 34645-71)
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: 317-236-1313
Facsimile: 317-231-7433
Email: Josh.Minkler@btlaw.com
         Kathleen.Matsoukas@btlaw.com
         Alyssa.Hughes@btlaw.com

Todd Foster
Todd Foster Law Group
601 Bayshore Blvd. Suite 615
Tampa, FL 33606
Telephone: 813-565-0600
Email: tfoster@tfosterlawgroup.com
 *Admitted pro hac vice*

David M. Garvin
David M. Garvin, P.A.
2333 Ponce De Leon Blvd. Ste 314
Coral Gables, FL 33134
Telephone: 305-371-8101
Email: dgarvin@garvin.law
*Admitted pro hac vice*

*Attorneys for Defendant Maximiliano Pilipis*

The government is attempting to extract an astronomical payday[1] from Defendant Maximiliano Pilipis ("Pilipis") based on a never-before-seen, shoe-horned, and ultimately defective money laundering case. But the government's case – including the Superseding Indictment, the applications for restraining orders and seizure warrants, and the civil forfeiture – all fail for one simple reason: AurumXchange.com's ("Aurum") failure to register as a money transmitting business was not a crime during the time it was in operation from 2009-2013. The government's position relies entirely on their misapplication of licensure requirements and misunderstanding of market activity that occurred over a decade ago.

Even if it was a crime from 2009-2013, the government cannot charge unlicensed operation of a money transmitting business under 18 U.S.C. § 1960 *or* seize the alleged proceeds, because the statutes of limitation for the § 1960 violation and the related civil forfeiture have long since run. Despite being well aware of Aurum's operation since at least 2010 and conducting a robust government-led investigation into market participants that were actually facilitating criminal proceeds and activity culminating in more than 20 well-publicized criminal indictments in 2013 and 2014, the government never charged Pilipis with anything. Pilipis had no reason to think that his own money was the product of any illegal activity; Aurum's operations were not illegal and the government never suggested they were. Now, in an effort to secure a colossal windfall 14 years later given the rise of the value of Bitcoin, the government claims that Pilipis's act of cashing his own Bitcoin on five specific instances in 2019, 2020, and 2021 constitutes money laundering pursuant to 18 U.S.C. § 1957 based on 18 U.S.C. § 1960(b)(1)(B) as the Specified Unlawful Activity ("SUA"). It is under this flawed theory that the government now seeks to restrain not just the money allegedly "involved in" the money

---

[1] *See* Exhibit 1 – Financial Information. Pilipis has separately requested to file Exhibit 1 under seal due to the sensitivity and confidentiality of the information therein. [*See* Filing No. 78.]

laundering offenses and explicitly referenced in Counts 1-5 (all of which has already been seized) but also *all* of the *uncashed* Bitcoin it alleges flowed from Aurum's operation – despite the fact that the uncashed Bitcoin has nothing to do with the alleged money laundering.

But the Court need not reach the question of the propriety of the restraint. Instead, it should simply dismiss Counts 1 through 5 of the Indictment because Aurum's failure to obtain a license for its commercial operations – the government's only alleged SUA at issue – was not a crime before 2013. On March 18, 2013, for the first time, the Financial Crimes Enforcement Network ("FinCEN"), the entity the government alleges had jurisdiction to regulate Aurum, stated that a newly defined virtual currency "exchanger" like Aurum would be considered a "money services business" and would be subject to registration requirements. [Filing No. 77-2 at 1.] Prior to that time, when Aurum was operating, the question of whether virtual currency exchangers were required to register was, at most, unclear; the terms "convertible virtual currency" and "exchanger" had never been defined by FinCEN, nor any other U.S. financial services regulator, prior to the new 2013 pronouncement.

For these reasons, Pilipis, by and through his undersigned counsel, files his Motion to Dismiss Counts 1-5 of the Indictment and opposition to the government's application for a post-indictment restraining order (the "Motion") requesting that this Court dismiss Counts 1-5 of the Indictment, dissolve the temporary restraining order entered on May 7, 2024 (the "TRO"), deny the government's application for a permanent restraining order, and return all seized and restrained property to Pilipis. In support of the Motion, Pilipis submits this memorandum of law.

## INTRODUCTION AND BACKGROUND

According to the Superseding Indictment, Max Pilipis operated Aurum, a virtual currency exchange, from approximately 2009 to 2013. [Filing No. 66 ¶ 14.] Aurum's purpose was to permit

an individual to exchange Bitcoin and other cryptocurrencies for U.S. currency or vice versa. *Id.* Aurum's transactions were solely single-party buy or sell transactions between Aurum on one side, and the customer on the other. Similar to making a purchase on eBay or Amazon, Aurum's customers purchased Bitcoin from Aurum or sold Bitcoin to Aurum; in return, Aurum received funds from that customer or sent Bitcoin to that customer. Aurum did not send funds between customers or provide money transmission services from customers to third parties.

Prior to March 2013, sellers of Bitcoin, like Aurum, were not required to be licensed as money transmission businesses with FinCEN because they were not considered to be "money transmitters" under existing FinCEN guidance. Critically, on March 18, 2013, FinCEN issued document FIN-2013-G001, entitled "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies." [Filing No. 77-2 at 2.] This guidance was issued, according to FinCEN, to "clarify the applicability of the regulations implementing the Bank Secrecy Act ("BSA") to persons creating, obtaining, distributing, exchanging, accepting, or transmitting virtual currencies." [Filing No. 77-2 at 1.] In testimony on November 18, 2013, then-FinCEN Director Jennifer Shasky Calvery confirmed that this was a "new, expanded definition of money transmission" and "would bring new financial entities under the purview of FinCEN's regulatory framework." [Filing No. 77-3 at 14.] Multiple other official, contemporaneous government statements confirm that the March 18, 2013 FinCEN announcement regarding exchangers constituted a material change to applicable licensing requirements: it defined a new basis for requiring virtual currency sellers to register with FinCEN. As a result of this pronouncement, Aurum ceased operations in or about May or June 2013 and thus did not violate any registration requirements for virtual currency exchangers. Without § 1960 as an SUA, Counts 1-5 of the Superseding Indictment collapse and must be dismissed.

Undeterred by the lack of illegal conduct in this case, and in an effort to make an end-run around the obvious statute of limitations problem, the government now seeks to prosecute Pilipis over ten years after Aurum ceased operations under a phony theory of money laundering. This in spite of the fact that federal law enforcement investigated Pilipis fourteen years ago, never identified any actual illegality or illegal proceeds, never charged him, never civilly forfeited the property, and never gave him any reason to believe that cashing the Bitcoin could be considered money laundering or the proceeds of any illegal activity in any way. Further, the investigation into Pilipis coincided with the federal government's investigation of other crypto-market participants in the same time period and asset class, culminating in the well-known 2013 and 2014 indictments and subsequent conviction of those actually responsible for supporting and facilitating illicit activity and money laundering. Pilipis was investigated simultaneously in connection with these markets and asset classes and was neither charged nor convicted of any such illegality or money laundering, nor was Aurum ever cited by FinCEN for a failure to register or obtain a license.

Even with the benefit of years of hindsight, the government makes no attempt to explain how it can restrain the property described in items 2(b), (c), and (e) under "Forfeiture Allegations" in Superseding Indictment (the "Disputed Property") given that it is not "involved in" or otherwise sufficiently connected to any of the five alleged acts of money laundering. [*See* Filing No. 66 at 9–10.] The government agrees that the property listed in 2(e) – the uncashed Bitcoin –are in separate wallets. *See id*. There are no allegations that those uncashed Bitcoin had any connection to the five alleged acts of money laundering at all. The property listed in 2(b) and 2(c) constitute the proceeds of Bitcoin that Pilipis cashed for the purpose of paying his counsel and also have no connection with and nothing to do with the five alleged counts of money

laundering. *See id*. Indeed, it was only when the undersigned informed the government that Pilipis intended to use his unconverted Bitcoin to pay his counsel that they immediately sought to restrain the property via a TRO, with no regard for the exception in 18 U.S.C. § 1957(f).

The government's case requires that the Court allow the government to restrain the Disputed Property indefinitely, even though the government cannot prosecute any crime to which that Disputed Property is connected. The government applied for its TRO despite knowing that any § 1960 prosecution or civil forfeiture was barred by the statute of limitations, and that the Bitcoin to be enjoined had nothing to do with Pilipis's alleged laundering of the Morgan Stanley funds. Moreover, the government knew that there was no urgency (given that Pilipis had been converting Bitcoin, according to the TRO Application, at various times over the years since 2015) and no risk that funds would be moved out of the government's reach (since the undersigned told them exactly where the money was going). [*See* Filing No. 41 at 3.] Even the government's own application admits that the converted Bitcoin funds that Pilipis was able to transfer before the TRO was issued did in fact go to five separate law firms. *Id*. at 11-12.

A finding by the Court that, as a matter of law, Pilipis/Aurum did not violate 18 U.S.C. § 1960, would require dismissal of Counts 1-5 of the Superseding Indictment and resolve all of these issues. To the extent the Court does not dismiss those counts at this time, Pilipis requests that the Court vacate the existing TRO and deny the government's request for a new restraining order with respect to the property identified in its Exhibit A, because, as a matter of law, the government cannot show that the property is sufficiently connected to Counts 1-5.

In sum, the government's case 1) is based upon an SUA that was not illegal at the time it occurred, 2) relies on a phony money laundering theory in order to circumvent the long-elapsed statute of limitations, and 3) seeks to extract an exorbitant amount of money from an individual

they originally began investigating at least 14 years ago, when the Bitcoin at issue was worth less than one dollar each.

## LEGAL STANDARD

An indictment is not sufficient unless "it (1) contains the elements of the offense charged, (2) sufficiently apprises the accused of what he must be prepared to meet, and (3) enables the accused to plead a judgment under the indictment as a bar to any subsequent prosecution for the same offense." *United States v. McComb*, 744 F.2d 555, 562 (7th Cir. 1984). Under Rule 12 of the Federal Rules of Criminal Procedure, Pilipis "may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). This includes the right to move prior to trial to dismiss an indictment for "failure to state an offense." *Id*. at (b)(3)(B)(v). This Court lacks jurisdiction when an indictment fails to sufficiently allege a federal crime, as this Indictment fails to do.

A defendant may also challenge a restraining order by challenging "whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related *to the crime charged in the indictment*." *Kaley v. United States*, 571 U.S. 320, 324 (2014) (emphasis added).

## ARGUMENT

### I.    The Superseding Indictment fails as a matter of law.

The government's application cites just one SUA: an alleged violation of 18 U.S.C. § 1960(b)(1)(B).[2] Specifically, § 1960(b)(1)(B) criminalizes the failure to comply with the money transmitting business registration requirements under section 5330 of title 31 of the Bank Secrecy Act ("BSA"). *See* 18 U.S.C. § 1960(b)(1)(B) (citing 31 U.S.C. § 5330).

---

[2] The Superseding Indictment references 18 U.S.C. § 1960(b)(1)(C) but states no facts to support a finding that Pilipis violated § 1960(b)(1)(C). [*See* Filing No. 66 at 6.] At best, the Superseding Indictment merely implies that Pilipis's alleged operation of Aurum without registering was attractive to users engaged in illicit activities. This case is about 18 U.S.C. § 1960(b)(1)(B).

**A. Aurum was not required to register as a virtual currency exchange with FinCEN prior to March 2013, and therefore no SUA exists.**

FinCEN, a bureau of the Treasury Department, is tasked with safeguarding the financial system from illicit activity, countering money laundering and the financing of terrorism, and promoting national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.[3] As such, FinCEN regularly releases guidance to the industry to assist businesses and individuals in complying with the BSA and related regulations. Relevant to this matter, 31 U.S.C. § 5330(a) requires that all "money transmitting businesses" (as that term is defined in 31 U.S.C. § 5330(d)(1)) engaged in "money transmitting" register with FinCEN.

Prior to March 18, 2013, it was unclear whether virtual currency sellers like Aurum were required to register with FinCEN. This was because the term "money transmission service," according to 31 U.S.C. § 5330(d)(2) included "accepting currency, funds, or value that substitutes for currency *and transmitting* the currency, funds, or value that substitutes for currency by any means, *including through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network*." 31 U.S.C. § 5330(d)(2) (emphasis added) [*See also* Filing No. 77-2 at 3.] At the time, according to the Superseding Indictment, Aurum was selling virtual currency. [Filing No. 66 ¶ 14.] As such, Aurum's only business was to conduct a purchase or sale with its customer. Aurum did not act as a third-party intermediary, did not transmit any funds from one person to another, did not utilize any banks, and was not a transmitter. *Id.* Additionally, prior to 2013, FinCEN had not made a determination as to whether the terms "funds," "currency," or "value that substitutes for currency" included virtual currency like Bitcoin. At the time, the legal

---

[3] *See* <u>Mission</u>, Dep't Treasury Fin. Crimes Enf't Network, https://www.FinCEN.gov/about/mission.

landscape was, *at best*, unclear even for entities that – unlike Aurum – were actually transmitting virtual currency.

For market participants like Aurum that offered only the purchase or sale of Bitcoin and other digital assets, there was also guidance from FinCEN that indicated that simple buy/sell activities did not constitute money transmission. FinCEN's 2011 Final MSB Rule provided an expressly defined limitation (limitation (F)) from the money transmission definition such that the term "money transmitter" would not include an entity like Aurum that "[a]ccepts and transmits funds only integral to the sale of goods or the provision of services, other than money transmission services, by the person who is accepting and transmitting the funds." [Filing No. 77-4 at 10.] Citing a ruling from 2004, FinCEN provided additional commentary, stating in pertinent part, "[P]ersons that sell goods or provide services other than money transmission services, and only transmit funds as an integral part of that sale of goods or provision of services, are not money transmitters." *Id*. As a result, market participants involved in the simple purchase and sale, *i.e.* non-transmitters and those not providing funded accounts or third-party transfers, believed that, like other sales of goods and services, any movement of funds relating to the purchase or sale of Bitcoin and other cryptocurrencies was not "money transmission" and occurred incidentally to the purchase or sale of the Bitcoin or other cryptocurrency.

On March 18, 2013, FinCEN expanded the application of the money transmitter definition when it issued official guidance titled "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies" [Filing No. 77-2 at 1.] In a press release announcing the 2013 Guidance, FinCEN specifically stated that it was published "in response to questions raised by financial institutions, law enforcement, and regulators concerning the regulatory treatment of persons who . . . make a business of exchanging,

accepting, and transmitting" convertible virtual currencies, like Bitcoin. [Filing No. 77-5 at 1.] The 2013 Guidance itself provided that it was issued "to clarify the applicability of the regulations implementing the Bank Secrecy Act ("BSA") to persons creating, obtaining, distributing, exchanging, accepting, or transmitting virtual currencies." [Filing No. 77-2 at 1.] In so stating, FinCEN admitted that, prior to March 2013, *it was not even clear to law enforcement and regulators* how these businesses should be treated under the BSA.

In fact, the 2013 Guidance was the first time FinCEN addressed virtual currencies at all and the first time that it defined the term "convertible virtual currencies." It effectively added a new definition applicable to a broader scope of financial activity relating to those convertible virtual currencies called "exchangers" of convertible virtual currency. FinCEN, for the first time, brought individuals and businesses involved in the purchase, sale, and exchange of virtual currencies within the definition of "money transmitter," and therefore within the umbrella of FinCEN's licensing requirements. In testimony before the United States Senate later that year on November 18, 2013, the then-Director of FinCEN stated that "the *new, expanded* definition of money transmission would bring new financial entities under the purview of FinCEN's regulatory framework" (emphasis added). [Filing No. 77-3 at 14.] Other government sources confirm that this was the case. For example, a 2015 Congressional Research Service report on Bitcoin cites the 2013 Guidance as the point at which registration was required for Bitcoin exchanges. [Filing No. 77-6 at 21.]

### B. There is no precedent to support the government's theory of pre-March 2013 registration requirements for virtual currency exchangers.

The government is unable to locate *any* case in which a virtual currency exchanger was criminally charged with a violation of 18 U.S.C. § 1960(b)(1)(B) for money transmission activity prior to March 2013 (let alone a money laundering charge with § 1960(b)(1)(B) as the only

SUA). This is because, prior to the issuance of FinCEN's guidance in March 2013, *no one believed such activity was obviously criminal*.

The only arguably comparable case is *United States v. $123,192.14 in U.S. Currency and 237.53575 Digital Currency Bitcoins (Powers)*, No. JKB-15-854 (D. Md. 2015), a civil forfeiture case. In that case, which was never criminally charged, Eric Powers acted as a peer-to-peer exchanger of Bitcoin from December 6, 2012 through September 24, 2014 (including for more than a year after the March 2013 guidance was issued), including providing actual transmission services, sending assets between customers. [*See* Filing No. 77-7 at 2.] He too was accused of failing to register with FinCEN but, unlike Pilipis, was never criminally prosecuted. Instead, in March of 2015, within the five-year statute of limitations for civil forfeiture, the government civilly seized $123,192.14 in U.S. Currency and 237.53575 BTC. In a settlement filed with the court on November 9, 2015, however, the government agreed to *release from seizure* 237.53575 BTC and $23,192.14 USD. Powers gave up $100,000 and got his Bitcoin back. [Filing No. 77-8 at 2.] Powers later consented to an assessment with FinCEN in 2019. [*See* Filing No. 77-7 at 1.] The assessment *specifically states* that Powers' Bitcoin exchange should have been registered *after the March 2013 FinCEN guidance* and that his failure to do so constitutes the violation. [Filing No. 77-7 at 2-3 nn. 5, 7.] Moreover, in a press release in 2019 at the time of the assessment, then-FinCEN Director Kenneth A. Blanco stated: "we will take enforcement action based on *what we have publicly stated since our March 2013 Guidance* - that exchangers of convertible virtual currency…are money transmitters and must register as MSBs." [Filing No. 77-9 at 1 (emphasis added).] Powers was ultimately assessed a fine of $35,350, and FinCEN forbade him from providing any money transmission services or participating in the affairs of

10

any financial institution in the future. [*See* Filing No. 77-7 at 9.] In total, Powers faced no criminal charges and paid only $135,350 in fines, penalties and forfeitures. *Id*. at 8-9.

Here, Pilipis faces *vastly* more aggressive consequences, including incarceration and forfeiture of Bitcoin and Bitcoin Cash, for actions taken prior to registration requirements, years after the statute of limitations have run. The government has no explanation for why it has proceeded this way.

The government's case against Pilipis based on § 1960(b)(1)(B) fails for the additional reason that, when in doubt, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates v. United States*, 574 U.S. 528, 547–48 (2015) (quoting *Cleveland v. United States,* 531 U.S. 12, 25 (2000) and *Rewis v. United States,* 401 U.S. 808, 812 (1971)). "Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." *Id.* (quoting *Liparota v. United States,* 471 U.S. 419, 427 (1985)). In *Yates*, the Supreme Court considered whether the term "tangible object" in 18 U.S.C. § 1519 included undersized red grouper that was evidence of the defendants' alleged violation of federal conservation regulations, after defendants disposed of the fish. *Yates*, 574 U.S. at 532. The Court found that while technically, fish may fall within the dictionary definition of 'tangible object,' there were no reliable indicators that Congress intended such an interpretation. *Id.* at 546-47. The Court refused to expose the defendant to a 20-year prison sentence and other penalties where there was ambiguity as to whether the provision applied to the defendant. *Id.* at 547-48.

The same is true here. The government's actions are explainable only by a motivation to forfeit Pilpis's Bitcoin, which is worth over 250 times more than it was in 2013. If that was not

enough, Pilipis also faces a prison term of 10 years or more. But in its fervor to restrain and ultimately forfeit this amount of Bitcoin, the government glosses over a fatal flaw: if the Court finds that it was even unclear whether a "virtual currency exchanger" was required to register with FinCEN prior to 2013, there can be no violation of 18 U.S.C. § 1960(b)(1)(B)), no SUA, no money laundering charge, and seizure or restraint of property derived from Aurum's operations. Counts 1-5 of the Superseding Indictment should be dismissed.

## II.    The government cannot restrain the Disputed Property in the forfeiture allegations of the Superseding Indictment.

The government has already initiated a civil forfeiture action with respect to the funds involved in the alleged money laundering, freezing over $9,000,000. *See United States v. All Funds Seized from and/or on Deposit from Morgan Stanley Accts. 658-091821-245 & 658-095221-24*, No. 1:23-cv-2081-JMS-MJD (S.D. Ind. Nov. 17, 2023). Nevertheless, the government seeks to restrain the Disputed Property despite making no argument whatsoever as to how the Disputed Property – separate Bitcoin held in separate wallets that had nothing to do with the allegedly laundered money – was involved in or used to facilitate the five counts of money laundering in the Superseding Indictment. [Filing No. 41 at 7–9.] The government claims that the property at issue in its application is forfeitable because it is "involved in" the money laundering offense and there is no exception for legal fees. *Id*. at 7-10. Both claims are wrong.

## A. The Disputed Property is not involved in or traceable to any of the charged § 1957 offenses.

However broad the government believes the money laundering statute to be, it cannot reach property that is plainly not "involved in" the money laundering offenses. 18 U.S.C. § 982(a)(1) provides that anyone convicted of money laundering under § 1957 will "forfeit to the United States any property, real or personal, *involved in such offense*, or any property traceable

to such property" (emphasis added). Despite the government's assertions that the money laundering forfeiture statute has broad reach, it is not absolute. *See e.g.*, *United States v. Arthur*, No. 04-CR-122, 2006 WL 2992865, at *5 (E.D. Wis. Oct. 18, 2006) (real property is not "involved in" a money laundering offense just because mortgage payments were money laundering offenses).

The government makes no attempt to show how separate and distinct Bitcoin held in separate and distinct wallets were used to facilitate or were otherwise involved in the money laundering offenses – offenses which involved the cashing of entirely separate and distinguishable Bitcoin held in separate wallets. Put differently, the Superseding Indictment charges money laundering offenses with respect to certain Bitcoins already cashed, but it attempts to restrain Bitcoin that is still uncashed as "involved in" money laundering. Instead of providing analysis on this point, the government attempts to muddy the waters by citing two cases, *United States v. Sterlingov*, No. 1:21-cr-00399-RDM, 2023 WL 2387759 (D.D.C. Mar. 6, 2023) and *United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020), stating that the cases show that "these concepts have been applied in cryptocurrency cases involving money laundering and unlicensed money transmitting business offenses." [Filing No. 41 at 9.] But the government entirely misses the most important point: that in both *Sterlingov* and *Harmon*, the defendants were charged with and ultimately convicted of or plead guilty to *substantive* counts of 18 U.S.C. § 1960. *Sterlingov*, No. 1:21-cr-00399-RDM, ECF No. 271; *Harmon*, No. 1:19-cr-00395-BAH, ECF No. 122. They were not, as Pilipis is, charged solely with money laundering related to proceeds that could not themselves be forfeited absent the allegations of money laundering. Critically, unlike in *Sterlingov* and *Harmon*, who engaged in post-2013 Guidance activity, the government cannot charge Pilipis with a violation of 18 U.S.C. § 1960 (and

13

criminally or civilly forfeit the proceeds of that alleged offense) because (1) Aurum's alleged activity predates the 2013 Guidance; and (2) the statutes of limitation in Pilpis's case has long run. Here, the only way the government can restrain the Disputed Property is to connect it to the charged money laundering counts – which it cannot do.

Moreover, in those cases, the operation of an unlicensed money transmitting business and the money laundering were conducted in tandem and could not be disentangled. For example, in *Harmon*, the defendant operated a cryptocurrency mixing business from June 2014 through December 2017. *Harmon*, 474 F. Supp. 3d at 83. FinCEN, in its summary of the *Harmon* enforcement matter, noted that "Mr. Harmon operated Helix as a bitcoin mixer, or tumbler, and advertised its services in the darkest spaces of the internet as a way for customers to anonymously pay for things like drugs, guns, and child pornography."[4] Harmon's mixer "was designed to be a 'bitcoin tumbler' that 'cleans' bitcoins by providing customers with new bitcoins 'which have never been to the darknet before.'" *Harmon*, 474 F. Supp. 3d at 83. FinCEN also points out that Harmon's actions took place *after* 2013, confirming again that the registration obligations arose out of the 2013 Guidance: "[a]s FinCEN clarified in its 2013 Guidance, exchangers and administrators of convertible virtual currency are money transmitters under the BSA. As such, they have an obligation to register with FinCEN; to develop, implement, and maintain an anti-money laundering compliance program; and to meet all applicable reporting and recordkeeping requirements."[5]

Similarly, defendant Sterlingov operated an unregistered cryptocurrency mixing business and did so through 2021, long after implementation of the registration requirement. *Sterlingov*,

---

[4] First Bitcoin "Mixer" Penalized by FinCEN for Violating Anti-Money Laundering Laws, Dep't Treasury Fin. Crimes Enf't Network (Oct. 19, 2020), https://www.fincen.gov/news/news-releases/first-bitcoin-mixer-penalized-fincen-violating-anti-money-laundering-laws.
[5] *Id*.

2023 WL 2387759 at *2. In that case, one of the "selling points" of the business (which was the unlicensed business under § 1960) was "that its operators could not be found by nor would they cooperate with the authorities." *Id.* Neither of these cases are applicable or controlling.

The Disputed Property – Bitcoin sitting in wallets and converted funds intended to be used for attorneys' fees – is not at all "involved in" the indicted money laundering count and the government has not presented any evidence to suggest otherwise. The content of the wallets has not been converted to U.S. currency, unlike the Bitcoin wallets used in the alleged money laundering. Each wallet is separate and distinct from the other, as evidenced in Exhibit A to the Superseding Indictment in which the government lists each wallet separately, identified by its unique address. Cashing the contents of one wallet, even if it did constitute money laundering (which it did not), has nothing to do with cashing the contents of another wallet.

**B.  The Disputed Property may be used, at a minimum, for legal fees.**

The government's assertion that Pilipis cannot use the Disputed Property for legal fees is not true. [*See* Filing No. 41 at 12.] First, the Disputed Property is not forfeitable because no crime has been committed related to the Disputed Property. Second, to the extent Pilipis converted cryptocurrency held in wallets to U.S. currency located in the Kraken and Citibank accounts, he had no notice that those funds were considered illicit by the government. In fact, despite the fact that the government knew of the existence of the Subject Property, Pilipis's conditions of release entered on January 29, 2024 explicitly provided that he could convert cryptocurrency to U.S. currency, without notice to the government, for the purpose of paying his legal fees. [Filing No. 77-10 at 5.]

Insofar as the government claims that Pilipis committed an additional act of money laundering by moving property from cryptocurrency wallets to the Citibank and Kraken

15

accounts, those actions were undertaken pursuant to 18 U.S.C. § 1957(f)(1), which excludes from the definition of monetary transaction "any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution." The property in those accounts belongs to Pilipis. He explicitly gave notice to the government through his attorneys on April 16, 2024 and again on April 24, 2024 that he intended to convert Bitcoin to U.S. currency for payment of legal fees; indeed, the undersigned entered appearances shortly thereafter. The government admits that the money went, or was intended to go, to law firm trust accounts. [*See* TRO App. 11-12, Filing No. 41.] If the government cannot show that the property to be restrained is involved in or facilitated the charged money laundering offenses, the property cannot be restrained and, at a minimum, can be used by Pilipis in his defense. *See Luis v. U.S.*, 578 U.S. 5, 10 (2016) ("[T]he pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment.").

### III. The government's requests to restrain assets that have nothing to do with the alleged crimes are motivated by a desire to impede Pilipis's access to counsel.

The government's decision to wait until 2024 to indict Pilipis and only *then* to seek to restrain all of his assets is unconscionable and prevents Pilipis from spending his own money, even when he can never be prosecuted for the alleged crime the government says that money was involved in. What is worse, despite seizing Pilipis's funds in January 2023 and indicting him in January 2024, the government declined to go after his other assets until days after the undersigned appeared in this case. The government's actions clearly evidence its attempt to prevent Pilipis's exercise of his Sixth Amendment Rights and should not be rewarded.

On April 16, 2024, the undersigned reached out to the government via telephone and email to let them know that Pilipis intended to convert Bitcoin to currency in order to pay his legal counsel. [Filing No. 77-11 at 3-4.] Pilipis's conditions of release expressly permitted Pilipis

to sell cryptocurrency for the purpose of obtaining funds to pay legal fees and did not require Pilipis to provide advance notice to the government. [Filing No. 77-10 at 5.] Nevertheless, Pilipis's counsel did so in good faith in an effort to be transparent. Having not received a response, on April 24, 2024, the undersigned sent a follow-up email to the government. [Filing No. 77-11 at 1.] The government responded later that day stating that the conditions of release excluded attorney fees from the financial transaction restrictions and that "defendants cannot use ill-gotten gains to pay their attorneys." [Filing No. 77-11 at 1.] Given that the only crime alleged against Pilipis at that time was money laundering, the alleged proceeds of which (an amount of approximately $9,373,703.57) had already been seized through civil forfeiture and remained seized (*see United States v. All Funds Seized from and/or on Deposit from Morgan Stanley Accts. 658-091821-245 & 658-095221-24*, No. 1:23-cv-2081-JMS-MJD (S.D. Ind. Nov. 17, 2023)), Pilipis began the process of converting Bitcoin he held in separate wallets using his account at Kraken, a cryptocurrency exchange, for the purpose of obtaining U.S. currency to pay his legal fees.

On May 7, 2024, just five days after the undersigned filed appearances in this case, almost 10 years after Aurum's last transaction and 14 years after federal law enforcement began investigating Pilipis, the government filed its *ex parte* motion for the TRO before Judge Klump [*See* Filing No. 41 at 1.] The motion sought two things: first, to enjoin all cryptocurrency, primarily Bitcoin, that could be connected (according to the government) to Aurum's operations. [*See* Filing No. 41 at 14.] Second, the government sought seizure warrants aimed at Pilipis's Kraken and Citibank accounts, which held funds and Bitcoin already cashed and intended for delivery to his legal counsel for payment of fees. [*See* Case No. 1:24-mj-00450-MKK Appl. for a Warrant to Seize Prop. Subject to Forfeiture, Attach. A; Case No. 1:24-mj-00451-MKK Appl.

for a Warrant to Seize Prop. Subject to Forfeiture, Attach. A.] The government made this application despite knowing that the alleged SUA could not be prosecuted or serve as the predicate for forfeiture because the applicable statutes of limitation had long since run. Moreover, the exception in 18 U.S.C. § 1957(f) was plainly applicable. After the court signed the TRO and issued the seizure warrants, the government, acting promptly for the first time in almost 14 years of investigation, seized the very same Bitcoin and funds it knew Pilipis intended to use to exercise his rights under the Sixth Amendment. Between the seizures and the TRO Order, Pilipis was effectively left with nothing and no ability to pay his counsel, let alone his day-to-day expenses.

This action is an abuse of prosecutorial discretion, contrary to the provisions of the U.S. Attorney Manual, and should not be rewarded by entry of the restraint sought here.

**IV.    Even if the funds the government seeks to restrain will ultimately be forfeitable, such an astronomical forfeiture amount will be prohibited by the Excessive Fines provision of the Eighth Amendment.**

Finally, should the government continue in its efforts to prosecute Pilipis and subject all of the restrained Bitcoin to criminal forfeiture, Pilipis would have a strong argument not only that the restrained proceeds are not the proceeds of any crime, but that the Eighth Amendment proscribes a forfeiture in such an exorbitant amount. The criminal forfeiture sought is subject to the limitations in the Eighth Amendment on excessive fines. *United States v. Bajakajian*, 524 U.S. 321, 333 (1998). The Seventh Circuit has held that "an unconstitutionally excessive fine can be identified by looking to: (1) the nature of the defendant's crime and its connection to other criminal activity, (2) whether the criminal statute is principally meant to reach people like the defendant, (3) the maximum punishment that could have been imposed, and (4) the harm caused by defendant's conduct." *United States v. Abair*, 746 F.3d 260, 267 (7th Cir. 2014) (citing *United*

*States v. Malewicka,* 664 F.3d 1099, 1104 (7th Cir. 2011)). All of these factors weigh in Pilipis's

favor and against the government. Notably, the maximum fine under § 1957(b)(2) is around $1.5

million. Here the government seeks to restrain and ultimately forfeit property valued at

substantially more than that, in an amount that is obviously excessive. Courts have found

forfeitures to be excessive in circumstances in which the amount or value of the property was far

less. *See, e.g., United States v. Stanford*, No. 12–146(08), 2014 WL 7013987, *4-6 (W.D. La.

Dec. 12, 2014) (Eighth Amendment prevents "grossly disproportionate" forfeiture of real

property even though property is technically forfeitable).

    If the restraining order is entered, it would sanction this type of behavior on the part of

the government. The government would in the future be emboldened to wait until a good time –

perhaps when an asset has appreciated significantly – to make its move. The government never

charged Mr. Pilipis with violating 18 U.S.C. § 1960 despite its awareness of the relevant activity

as early as 2010. One need not be a rocket scientist to understand why the government is only

now pursuing this case when one Bitcoin is worth over $67,000. Worse, the government

contends that *any* conversion of Bitcoin derived from Pilipis's operation of Aurum, for which he

can never be found guilty, is and will be considered criminal money laundering. This cannot be

what the law intends. At best, there exists serious doubt about whether the SUA was even a

crime at all. At worst, this is nothing more than an opportunistic shakedown.

## V.    Pilipis requests a post-restraint hearing to determine whether the restrained assets are subject to forfeiture.

    To the extent the Court does not dismiss the indictment and/or deny the government's

motion for an extended restraining order, Pilipis respectfully requests a hearing for a

determination on whether the Disputed Property is sufficiently related to the five counts of

money laundering charged in the Superseding Indictment. "Since *Monsanto*, the lower courts

have generally provided a hearing to any indicted defendant seeking to lift an asset restraint to pay for a lawyer. In that hearing, they have uniformly allowed the defendant to litigate ... whether probable cause exists to believe that the assets in dispute are traceable or otherwise sufficiently related to the crime charged in the indictment." *Kaley v. United States*, 571 U.S. 320, 324 (2014); *see also United States v. Shah*, No. 19 CR 864, 2024 WL 2959315, at *5 (N.D. Ill. June 12, 2024) ("Under longstanding Seventh Circuit case law, defendants are entitled to an 'immediate, postrestraint, adversary hearing at which the government is required to prove the likelihood that the restrained assets are subject to forfeiture.' That procedure aligns with the practice of courts across the country.") (internal citations omitted).

As outlined above, at least some if not all of these assets are not subject to forfeiture because they are not the proceeds of a crime and not "involved in" any money laundering offense. The restraints have effectively bankrupted Pilipis, who not only needs funds for daily expenses and legal fees but also to address the tens of thousands of dollars of damage he suffered from Hurricane Helene and Hurricane Milton. Accordingly, and in the alternative, Pilipis requests a postrestraint hearing to address the forfeitability of the Subject Property.

## CONCLUSION

For the reasons outlined above, Maximiliano Pilipis respectfully requests that this Court dismiss the Superseding Indictment in its entirety and release all property subject to restraint. In the alternative, Pilipis requests that the Court deny the government's request for a renewed restraining order, vacate the existing restraining order, and release the property to Pilipis. Should the Court grant the government's motion, Pilipis requests a hearing on these matters.

Respectfully submitted,

*/s/ Josh Minkler*

Josh Minkler (Atty. No. 18483-49)
Kathleen L. Matsoukas (Atty. No. 31833-49)
Alyssa Hughes (Atty. No. 34645-71)
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: 317-236-1313
Facsimile: 317-231-7433
Email: Josh.Minkler@btlaw.com
          Kathleen.Matsoukas@btlaw.com
          Alyssa.Hughes@btlaw.com

Todd Foster
Todd Foster Law Group
601 Bayshore Blvd. Suite 615
Tampa, FL 33606
Telephone: 813-565-0600
Email: tfoster@tfosterlawgroup.com
*Admitted pro hac vice*

David M. Garvin
David M. Garvin, P.A.
2333 Ponce De Leon Blvd. Ste 314
Coral Gables, FL 33134
Telephone: 305-371-8101
Email: dgarvin@garvin.law
*Admitted pro hac vice*

*Attorneys for Defendant Maximiliano Pilipis*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that a copy of the foregoing has been served on

all counsel of record via the Court's electronic filing system on this 25th day of October, 2024.

*/s/ Josh Minkler*
Josh Minkler