UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | 1:24-cr-00009-JMS-MKK |
| *vs.* | ) | |
| | ) | |
| MAXIMILIANO PILIPIS, | ) | -01 |
| | ) | |
| *Defendant.* | ) | |

**ORDER**

On October 16, 2024, the Government filed a Superseding Indictment charging Defendant Maximiliano Pilipis with five counts of Money Laundering in violation of 18 U.S.C. § 1957 and two counts of Willful Failure to File Tax Return in violation of 26 U.S.C. § 7203. [Filing No. 66.] Presently pending before the Court is Mr. Pilipis's Motion to Dismiss Counts 1-5 of the [Superseding] Indictment, [Filing No. 77], which is ripe for the Court's decision.

**I.**
**BACKGROUND**

The Superseding Indictment describes the conduct underlying Counts 1 through 5 as follows:

> AurumXchange.com [("AurumXchange")] was a currency exchange website operated through Aurum Capital Holdings, Inc. by [Mr. Pilipis] out of Noblesville, Indiana from in or about 2009 through in or about 2013. AurumXchange exchanged virtual currencies for other virtual currencies or for fiat currencies[1] for its customers. AurumXchange also exchanged fiat currencies for other virtual currencies for its customers. The customers paid fees to AurumXchange for these transactions, which were paid to [Mr. Pilipis] in the form of virtual currency and/or fiat currency.

\*          \*          \*

---

[1] "Fiat currency" is "'real money' – currency that is backed by a government, such as dollars." *Hawes v. Argo Blockchain plc*, 2024 WL 4451967, at \*2 n.2 (S.D.N.Y. Oct. 9, 2024).

Beginning on a date unknown but at least as early as 2009 and continuing until at least as late as 2013, [Mr. Pilipis], through AurumXchange and its associated entities, transferred funds on behalf of the public by receiving virtual currencies and/or fiat currencies from customers, and transferring other virtual currencies or fiat currencies back to these customers, in exchange for a fee.  For instance, [Mr. Pilipis], through AurumXchange:

    a.      Exchanged virtual currencies for other virtual currencies;

    b.      Exchanged virtual currencies for fiat currencies; and

    c.      Exchanged fiat currencies for virtual currencies.

To exchange virtual currencies for other virtual currencies, the AurumXchange customer would transfer virtual currency from their virtual currency account to a virtual currency account controlled by [Mr. Pilipis].  [Mr. Pilipis] would then transfer a different virtual currency to that customer's respective virtual currency account.  [Mr. Pilipis] would charge a fee for this transaction.

To exchange virtual currencies for fiat currencies, an AurumXchange customer would transfer virtual currency from their virtual currency account to a virtual currency account controlled by [Mr. Pilipis].  [Mr. Pilipis] would then transfer fiat currency to the customer through AurumXchange in one of several ways.  For example, the customer would purchase an instant load debit card from AurumXchange.  AurumXchange would mail the instant load debit card to the customer.  [Mr. Pilipis] would load the instant load debit card with fiat currency. In addition, [Mr. Pilipis] would also send wire transfers of fiat currency directly to customer accounts.  [Mr. Pilipis] would charge a fee for these transactions.

To exchange fiat currencies for virtual currencies, an AurumXchange customer would send cash and/or wire transfers of fiat currency to an account controlled by [Mr. Pilipis].  [Mr. Pilipis] would then transfer virtual currency from a virtual currency account controlled by [Mr. Pilipis] into the customer's virtual currency account.  [Mr. Pilipis] would charge a fee for this transaction.

During the timeframe that AurumXchange operated, it served over 8,000 customers and conducted over 100,000 transactions to exchange virtual and fiat currencies for those customers, resulting in over 30 million dollars['] worth of funds being run through AurumXchange.  [Mr. Pilipis] collected fees worth millions of dollars over the course of the operation of the business.

During the timeframe that AurumXchange operated, neither Aurum Capital Holdings, Inc., [AurumXchange], [Mr. Pilipis], nor any other entity affiliated with

[Mr. Pilipis] ever registered as a money transmitting business with FinCEN,[2] as required by the relevant laws and regulations.

By not registering as a money transmission business, [Mr. Pilipis] ran AurumXchange with no oversight by FinCEN or other federal agencies. As a result, customers of AurumXchange were able to exchange virtual currency and fiat currency anonymously. Additionally, AurumXchange was able to conduct transactions much more quickly by not having to comply with the statutes and regulations imposed on registered money transmitting businesses. As such, AurumXchange provided a safe haven for those who engaged in illegal activities to conceal their proceeds. For instance, a portion of the funds flowing through AurumXchange came from accounts that were held on Silk Road, an anonymous Internet marketplace that hosted illicit activities, including but not limited to the sale of drugs.

In conducting these transactions, AurumXchange was an unlicensed money transmitting business as defined under [18 U.S.C. §§ 1960(b)(1)(B) and (C)].

In or around 2013, [Mr. Pilipis] ceased to operate Aurum Capital Holdings, Inc. At that time, [Mr. Pilipis] controlled over 10,000 Bitcoin that were derived from the unlicensed money transmitting business valued at approximately 1.2 million dollars at that time.

[Mr. Pilipis] began to split up and transfer the Bitcoin that he had accumulated through AurumXchange to various anonymously held Bitcoin addresses. Over the next several years, [Mr. Pilipis] transferred Bitcoin multiple times to other anonymously held addresses to conceal the proceeds.

The Bitcoin remained in those addresses for years until in or about 2018, when [Mr. Pilipis] began converting the virtual currency proceeds into U.S. currency in order to spend and convert them to other assets. [Mr. Pilipis] used, spent, and converted the unlawful proceeds from the unlicensed money transmitting business in amounts exceeding $10,000, including the following:

    a.    On or about September 10, 2018, [Mr. Pilipis] purchased the property located at 109 South West Street, Arcadia, Indiana 46030 for $119,454 paid from his Morgan Stanley account ending in 1245.

---

[2] FinCEN is the Financial Crimes Enforcement Network, "a bureau of the U.S. Department of the Treasury [whose] mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence." https://www.fincen.gov/what-we-do.

   b.   On or about April 3, 2019, [Mr. Pilipis] purchased the property located at 1296 Conner Street, Noblesville, Indiana for $278,954 paid from his Morgan Stanley account ending in 1245.

   c.   On or about November 8, 2019, [Mr. Pilipis] wired $20,000 from his Morgan Stanley account ending in 1245 to his First Merchants Bank account ending in 4443.

   d.   On or about January 30, 2020, [Mr. Pilipis] wired $28,000 from his Morgan Stanley account ending in 1245 to his First Merchants Bank account ending in 4443.

   e.   On or about June 25, 2021, [Mr. Pilipis] sold the property located at 109 South West Street, Arcadia, Indiana 46030 and received $139,560.27 in his Bank of America account ending in 4797.

   f.   On or about August 31, 2021, [Mr. Pilipis] sold the property located at 1296 Conner Street, Noblesville, Indiana and received $297,360.26 in his Bank of America account ending in 5481.

[Mr. Pilipis] also invested a large portion of the Bitcoin he cashed out using an investment account at Morgan Stanley and, through that investment account, realized hundreds of thousands of dollars in income in 2019 and 2020. [Mr. Pilipis] failed to file tax returns for Tax Years 2019 and 2020 as required by law.

[Filing No. 66 at 1-7.]

Mr. Pilipis is charged with five counts of Money Laundering in violation of 18 U.S.C. § 1957 in connection with the April 3, 2019, November 8, 2019, January 30, 2020, June 25, 2021, and August 31, 2021 transactions described above. [Filing No. 66 at 7-8.] He is also charged with two counts of Willful Failure to File Tax Return in violation of 26 U.S.C. § 7203 for the calendar years 2019 and 2020. [Filing No. 66 at 8-9.] Additionally, the Superseding Indictment seeks the forfeiture of "any property, real or personal, involved in [the Money Laundering counts], and any property traceable to such property [(the "Subject Property")]." [Filing No. 66 at 9-11.] The Government has also initiated a civil forfeiture action related to two of Mr. Pilipis's bank accounts. *See United States v. All Funds Seized From and/or on Deposit From Morgan Stanley Accts. 658-*

*091821-245 & 658-095221-245*, Cause No. 1:23-cv-02081-JMS-MJD (the "Civil Forfeiture Case").

Mr. Pilipis filed his Motion to Dismiss in this case on October 25, 2024 and seeks dismissal of Counts 1 through 5 – the Money Laundering counts – only. [Filing No. 77.] The Motion to Dismiss is now ripe for the Court's consideration.

## II.
### STANDARD OF REVIEW

An indictment must: "(1) state[ ] the elements of the offense charged; (2) fairly inform[ ] the defendant of the nature of the charge so that he may prepare a defense; and (3) enable[ ] him to plead an acquittal or conviction as a bar against future prosecutions for the same offense." *United States v. Miller*, 883 F.3d 998, 1002 (7th Cir. 2018) (quotation and citation omitted). A defendant may move to dismiss an indictment pursuant to Federal Rule of Criminal Procedure 12(b). Specifically, Rule 12(b)(1) allows a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Further, Rule 12(b)(3)(B)(v) requires the defense of "failure to state an offense" to be raised "by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." In considering a motion to dismiss an indictment, the Court must "view all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999).

## III.
### DISCUSSION

The Court notes at the outset that the Superseding Indictment charges two specified unlawful activities to support the Money Laundering charges: (1) a violation of 18 U.S.C. § 1960(b)(1)(B), which defines "unlicensed money transmitting business" as one which "fails to

comply with the money transmitting business registration requirements under [31 U.S.C. § 5330], or regulations prescribed under such section"; and (2) a violation of 18 U.S.C. § 1960(b)(1)(C), which defines "unlicensed money transmitting business" as one which "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." [*See* Filing No. 66 at 7-8.]    In order to have violated either § 1960(b)(1)(B) or § 1960(b)(1)(C), AurumXchange had to have been considered a "money transmitting business." *See* 18 U.S.C. § 1960(a) (setting forth penalties for conducting, controlling, managing, supervising, directing, or owning all or part of an unlicensed "money transmitting business"); 18 U.S.C. § 1960(b) (defining "unlicensed *money transmitting business*") (emphasis added).   Accordingly, the Court begins by considering whether AurumXchange was a "money transmitting business" such that it could have violated § 1960(b)(1)(B) or (C) and then have engaged in money laundering related to the property it derived from those violations.   The parties focus their arguments on § 1960(b)(1)(B), but to the extent they discuss whether AurumXchange was a "money transmitting business," their arguments apply with equal force to § 1960(b)(1)(C).[3]

In support of his Motion to Dismiss, Mr. Pilipis argues that § 1960(b)(1)(B) "criminalizes the failure to comply with the money transmitting business registration requirements under section 5330 of title 31 of the Bank Secrecy Act," but argues that AurumXchange was not required to

---

[3] The parties' specific arguments regarding § 1960(b)(1)(C) focus on whether the Government alleged in the Superseding Indictment that Mr. Pilipis knew that funds AurumXchange allegedly transported or transmitted were "derived from a criminal offense or [were] intended to be used to promote or support unlawful activity." 18 U.S.C. § 1960(b)(1)(C). [*See* Filing No. 80 at 7 n.2; Filing No. 92 at 9-10; Filing No. 96 at 7-9.] The Court need not decide that issue because, as discussed below, it finds that AurumXchange was not a "money transmitting business" subject to any of the subsections of § 1960, including § 1960(b)(1)(C).

register as a virtual currency exchange with FinCEN prior to March 2013 so there is no specified unlawful activity to support Counts 1 through 5. [Filing No. 80 at 7-10.] Mr. Pilipis asserts that prior to March 18, 2013, "it was unclear whether virtual currency sellers like [AurumXchange] were required to register with FinCEN" because the term "money transmission service" as used in applicable statutes only included entities who accepted currency and then transmitted the currency. [Filing No. 80 at 8.] He contends that according to the Superseding Indictment, AurumXchange was selling virtual currency but "did not act as a third-party intermediary, did not transmit any funds from one person to another, did not utilize any banks, and was not a transmitter." [Filing No. 80 at 8.] Mr. Pilipis argues further that before 2013, FinCEN had not determined whether the terms "funds," "currency," or "value that substitutes for currency" included virtual currency like Bitcoin, and that "[a]t the time, the legal landscape was, at best, unclear even for entities that – unlike [AurumXchange] – were actually transmitting virtual currency." [Filing No. 80 at 8-9] (emphasis omitted).] Mr. Pilipis points to FinCEN's 2011 Final [Money Service Businesses ("MSB")] Rule, which he contends excluded from the definition of "money transmitter" entities that "[a]ccept[ ] and transmit[ ] funds only integral to the sale of goods or the provision of services, other than money transmission services, by the person who is accepting and transmitting the funds." [Filing No. 80 at 9 (quotation and citation omitted).] He argues that on March 18, 2013, FinCEN issued guidance (the "2013 Guidance") in response to questions raised by financial institutions, law enforcement, and regulators, which expanded the "money transmitter" definition to include those who "make a business of exchanging, accepting, and transmitting convertible virtual currencies, like Bitcoin." [Filing No. 80 at 9-10 (quotations and citation omitted).] Mr. Pilipis notes that "the 2013 Guidance was the first time FinCEN addressed virtual currencies at all and the first time that it defined the term 'convertible virtual currencies.'" [Filing No. 80 at 10.]

He asserts that the Government cannot cite to any cases in which a virtual currency exchanger was criminally charged with a violation of 18 U.S.C. § 1960(b)(1)(B) for activity that occurred before March 2013 because "prior to the issuance of [the 2013 Guidance], no one believed such activity was obviously criminal." [Filing No. 80 at 10-11 (emphasis omitted).] He argues further that, under the Rule of Lenity, "when in doubt, ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." [Filing No. 80 at 11-21 (quotation and citation omitted).] Finally, Mr. Pilipis argues that "[t]he government's actions are explainable only by a motivation to forfeit [Mr.] Pilipis's Bitcoin, which is worth over 250 times more than it was in 2013." [Filing No. 80 at 12.]

In its response, the Government argues that the facts alleged in the Superseding Indictment meet § 1960's definition of "money transmitting," which is defined as "transferring funds on behalf of the public by any and all means." [Filing No. 92 at 7 (quotation and citation omitted).] It asserts that "[b]oth the transfers of fiat currency and the transfers of virtual currency clearly constitute the transmission of 'money' or 'funds.'" [Filing No. 92 at 8.] The Government also argues that AurumXchange falls within the definition of "money services business"[4] set forth in 31 U.S.C. § 5330(d)(1)(A) because that definition includes "any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system." [Filing No. 92 at 9 (quotation and citation omitted).] The Government contends that because the Superseding Indictment sufficiently charges that Mr. Pilipis violated § 1960, it need not also charge that he violated FinCEN regulations but, in any event, "[t]he FinCEN

---

[4] Section 5330(d)(1)(A) defines "money transmitting business," so the Court surmises that the Government's reference to "money services business" is a typographical error.

regulations clearly apply to [Mr. Pilipis's] actions alleged in the superseding indictment, and extended not just to fiat currencies, but also virtual currencies." [Filing No. 92 at 11.] It argues that the FinCEN regulations "make clear that the [registration] requirement applies to any entity falling within one of the categories of 'money services business'" and that by 2009, "at least one court had already ruled that the regulations in place at the time applied to virtual currencies." [Filing No. 92 at 11-12 (citation omitted).] The Government asserts that in 2011, FinCEN issued a Final Rule in order to "reflect…evolving technologies," which "made it explicit that companies that transmit 'value that substitutes for currency' fell under the regulatory definition of a money transmitter." [Filing No. 92 at 12-13 (citation and quotation omitted).] It argues that Mr. Pilipis's reliance on FinCEN's 2013 Guidance is misplaced because the Superseding Indictment does not refer to the 2013 Guidance and his "argument that FinCEN intended to create new law or liability by issuing the 2013 Guidance is without merit and has already been rejected by the courts." [Filing No. 92 at 14-15.] The Government contends that the 2013 Guidance "merely reasserts what the FinCEN Regulations themselves already made clear – that the definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies" – and cites to cases that it argues "rejected the argument that the 2013 Guidance is what criminalized the defendant's conduct." [Filing No. 92 at 16-17 (quotation and citations omitted).] Finally, the Government argues that the Rule of Lenity does not apply because "there is no irreconcilable ambiguity in §§ 1960 or 5330." [Filing No. 92 at 18.]

In his reply, Mr. Pilipis argues that the Government misstates the definition of "money transmitter" in the 2011 Final Rule and also does not acknowledge Limitation F contained in the 2011 Final Rule, which excluded from the definition of "money transmitter" an entity that "[a]ccepts and transmits funds only integral to the sale of goods or the provision of services, other

than money transmission services, by the person who is accepting and transmitting the funds." [Filing No. 96 at 2 (quotation and citation omitted).] He asserts that "[n]ot until 2013 was the simple commercial sale of Bitcoin regulated by FinCEN under the newly minted 2013 definition for a convertible virtual currency 'exchanger,' a new sub-type of MSB financial institution defined by FinCEN in the 2013 Guidance." [Filing No. 96 at 3.] Mr. Pilipis reiterates that the 2013 Guidance is relevant because it stated that it was issued to clarify the application of regulations implementing the Bank Secrecy Act to people exchanging virtual currencies. [Filing No. 96 at 3.] He notes that the Department of Justice's Asset Forfeiture Policy Manual cites only to the 2013 Guidance and argues further that the cases the Government relies upon in its response "involved either: (1) defendants who were 'money transmitters' under the 2011 definition (and not mere exchangers); or (2) activity that took place after the 2013 Guidance and after the defendant would have had notice of the change in definition" or "the defendant was also charged with a substantive violation of 18 U.S.C. § 1960." [Filing No. 96 at 4-5.] Mr. Pilipis asserts that "[c]ontrary to the government's continued declarations to the contrary, this is a never-before-seen case and there is a reason for that – it is legally deficient." [Filing No. 96 at 7.]

18 U.S.C. § 1960 provides in relevant part:

(a)    Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an ==unlicensed money transmitting business==, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

(b)    As used in this section –

(1)    the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and –

*            *            *

(B)    <mark>fails to comply with the money transmitting business registration requirements under [31 U.S.C. § 5330], or regulations prescribed under such section;</mark> or

(C)    <mark>otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.</mark>

18 U.S.C. § 1960 (emphasis added).  Section 1960(b)(2) defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile or courier."  18 U.S.C. § 1960(b)(2).

The version of 31 U.S.C. § 5330 in effect at the time the acts alleged in the Superseding Indictment occurred provided in relevant part:

(a)    Registration with Secretary of the Treasury required. –

(1)    In general. – Any person who owns or controls a money transmitting business shall register the business (whether or not the business is licensed as a money transmitting business in any State) with the Secretary of the Treasury [as provided for in the statute].

*                    *                    *

(d)    Definitions. – For purposes of this section, the following definitions shall apply:

(1)    Money transmitting business. – The term "money transmitting business" means any business other than the United States Postal Service which –

(A)    Provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institution system;

- 11 -

(B)      is required to file reports under section 5313; and

(C)      is not a depository institution (as defined in section 5313(g)).

31 U.S.C. § 5330(d)(1) (eff. Oct. 26, 2001 to Dec. 31, 2020).  "Money transmitting service," as

referred to in § 5330(d)(1)(A), was defined as:

> [A]ccepting currency or funds denominated in the currency of any country and
> transmitting the currency or funds, or the value of the currency or funds, by any
> means through a financial agency or institution, a Federal reserve bank or other
> facility of the Board of Governors of the Federal Reserve System, or an electronic
> funds transfer network.

31 U.S.C. § 5330(d)(2) (eff. Oct. 26, 2001 to Dec. 31, 2020).

The crux of Mr. Pilipis's argument is that: (1) AurumXchange does not fit within the

definition of "money transmitting service" – and, therefore, was not a "money transmitting

business" subject to § 1960 – because it only "conduct[ed] a purchase or sale with its customer,"

and did not "act as a third-party intermediary, did not transmit any funds from one person to

another, did not utilize any banks, and was not a transmitter"; and (2) even if AurumXchange was

a "money transmitting service," it was not clear that § 1960 applied to the transmission of virtual

currency.  [Filing No. 80 at 8-9.]  The crux of the Government's argument is that: (1) in order to

be a "money transmitting business," AurumXchange does not have to be a "money transmitting

service," but can be "any person who engages as a business in an informal money transfer system

or any network of people who engage as a business in facilitating the transfer of money

domestically or internationally outside of the conventional financial institute system," which

AurumXchange did; and (2) it was clear that § 1960 applied to the transmission of virtual currency

during the time frame that AurumXchange was operating.  [Filing No. 92 at 9 (quotation and

citation omitted); Filing No. 92 at 14-19.]

The Superseding Indictment charges that AurumXchange exchanged virtual currencies for other virtual currencies or for fiat currencies, and exchanged fiat currencies for virtual currencies, and that this constituted acting as a "money transmitting business" for purposes of § 1960. [*See* Filing No. 66 at 1-3.] Mr. Pilipis seizes on the portion of the definition of "money transmitting business" in the statute that includes a "money transmitting service," arguing that AurumXchange did not "transmit" anything. [Filing No. 80 at 8.] The Government focuses on other portions of the definition of "money transmitting business." [Filing No. 92 at 9.] Below, the Court considers each component of the definition of "money transmitting business" in effect at the time the activities that are the subject of the Superseding Indictment occurred.

### A.    "Money Transmitting Service"

The Superseding Indictment alleges that:

- For a customer exchanging virtual currency for virtual currency, the customer would transfer virtual currency from their virtual currency account to a virtual currency account controlled by Mr. Pilipis. For a fee, Mr. Pilipis would then transfer a different virtual currency to the customer's virtual currency account.

- For a customer exchanging virtual currency for fiat currency, the customer would transfer virtual currency from their virtual currency account to a virtual currency account controlled by Mr. Pilipis. For a fee, Mr. Pilipis would then transfer fiat currency to the customer through AurumXchange by:

  - the customer purchasing an instant load debit card from AurumXchange, which Mr. Pilipis would then load with fiat currency and mail to the customer; or

  - sending a wire transfer of fiat currency directly to the customer's account.

- For a customer exchanging fiat currency for virtual currency, the customer would send cash and/or wire transfers of fiat currency to an account controlled by Mr. Pilipis. For a fee, Mr. Pilipis would then transfer virtual currency from a virtual currency account controlled by Mr. Pilipis into the customer's virtual currency account.

[Filing No. 66 at 4-5.]

A "money transmitting service" – as defined in the version of 31 U.S.C. § 5330(d)(2) effective at the time of the activities described in the Superseding Indictment – is an entity that engages in "accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, or the value of the currency or funds, by any means through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network." 31 U.S.C. § 5330(d)(2) (eff. Oct. 26, 2001 to Dec. 31, 2020). The Superseding Indictment alleges that Mr. Pilipis used wire transfers to accomplish some exchanges of virtual currency for fiat currency. [*See* Filing No. 66 at 4 (Superseding Indictment alleging that in order to exchange a customer's virtual currency for fiat currency, Mr. Pilipis would sometimes "send wire transfers of fiat currency directly to customer accounts")]. The use of financial institutions for the wire transfers might suggest that AurumXchange was a "transmitter." *See also* 18 U.S.C. § 1960(b)(2) (defining "money transmitting" as "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier"). But in order to be a "money transmitting service," AurumXchange still had to be accepting "currency or funds denominated in the currency of any country" from a customer. 31 U.S.C. § 5330(d)(2) (eff. Oct. 26, 2001 to Dec. 31, 2020). In considering whether virtual currency fell within that scope during the time frame that AurumXchange was operating, the Court finds FinCEN's 2013 Guidance particularly significant.

Specifically, the 2013 Guidance provides a picture of the world's view of cryptocurrency prior to that time.[5] FinCEN noted that the 2013 Guidance was to "clarify the applicability of the regulations implementing the Bank Secrecy Act…to persons creating, obtaining, distributing, exchanging, accepting, or transmitting virtual currencies." [Filing No. 77-2 at 1.] It went on to state that for de-centralized virtual currencies like Bitcoin, "(1) that has no central repository and no single administrator, and (2) that persons may obtain by their own computing or manufacturing effort":

> [A] person that creates units of convertible virtual currency and sells those units to another person for real currency or its equivalent is engaged in transmission to another location and is a money transmitter.

[Filing No. 77-2 at 5.] This approach is reflected in the Anti-Money Laundering Act of 2020, when Congress expanded the definition of "Money transmitting business" to include "any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency." 31 U.S.C. § 5330(d)(1)(A) (eff. Jan. 1, 2021). The 2013 Guidance suggests that, after its issuance, AurumXchange would be considered a "money transmitter" engaged in a "money transmitting business" because it was acting as an exchange by providing de-centralized virtual currency in exchange for fiat currency. FinCEN's 2011 Final Rule also supports the conclusion that AurumXchange was not a "money transmitter" before the 2013 Guidance clarified the reach of § 1960. The 2011 Final Rule included Limitation F, which states that a "money

---

[5] The Government asserts in a footnote that "the superseding indictment alleges that the Defendant was transmitting both fiat and virtual currencies," and that "[t]he transferring of fiat currencies is not discussed in the Defendant's brief, and for that reason alone, the money laundering charges survive the motion to dismiss." [Filing No. 92 at 11 n.15.] But the Superseding Indictment alleges that each exchange involved virtual currency in some way – either virtual currency for other virtual currency, virtual currency for fiat currency, or fiat currency for virtual currency. It does not allege that AurumXchange exchanged fiat currency for fiat currency, so whether the definition of "money transmitting service" or "money transmitting business" included those that exchanged virtual currency is the key issue here.

transmitter" did not include an entity that "[a]ccepts and transmits funds only integral to the sale of goods or the provision of services, other than money transmission services, by the person who is accepting and transmitting the funds." 31 C.F.R. § 1010.100(ff)(5)(ii)(F).

The Director of FinCEN, Jennifer Shasky Calvery, spoke to the United States Senate Committee on Homeland Security and Government Affairs about the 2013 Guidance on November 18, 2013. In her statement, she explained that prior to 2013 "virtual currencies [had] yet to overtake more traditional methods to move funds internationally, whether for legitimate or criminal purposes." [Filing No. 77-3 at 7.] Director Calvery noted that the 2013 Guidance "clarifies definitions and expectations to ensure that businesses engaged in [dealing with virtual currency] are aware of their regulatory responsibilities, including registering appropriately" and stated that "[t]he decision to bring virtual currency within the scope of our regulatory framework should be viewed by those who respect and obey the basic rule of law as a positive development for this sector." [Filing No. 77-3 at 9-10.] She also discussed FinCEN's outreach efforts to the virtual currency industry, noting that FinCEN "[r]ecogniz[ed] that the new, expanded definition of money transmission would bring new financial entities under the purview of FinCEN's regulatory framework." [Filing No. 77-3 at 14.] Director Calvery's statements further support the conclusion that exchangers of virtual currencies were not considered money transmitters prior to the 2013 Guidance.

The Court acknowledges the cases the Government points to in which various courts outside of the Seventh Circuit found that transmitters or exchangers of virtual currencies were subject to the registration requirements of § 1960. But the majority of those cases involved conduct that occurred, at least in part, after the 2013 Guidance was issued. *See United States v. Freeman*, 688 F. Supp. 3d 1 (D.N.H. 2023); *United States v. Stetkiw*, 2019 WL 417404 (E.D. Mich. Feb. 1,

2019); *United States v. Mansy*, 2017 WL 9672554 (D. Me. May 11, 2017); *United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016); *United States v. Faiella*, 39 F. Supp. 3d 544 (S.D.N.Y. 2014).[6]  Other cases relied upon by the Government involved transmissions to third parties of virtual currency, rather than the type of exchanges from a customer to AurumXchange and then from AurumXchange back to the same customer, as outlined in the Superseding Indictment here.  *See United States v. Budovsky*, 2015 WL 5602853, at *1 (S.D.N.Y. Sept. 23, 2015) (entity controlled by defendant "provid[ed] access to instant real-time [digital] currency for international commerce, which could be used to send and receive payments from anyone, anywhere on the globe") (quotation omitted); *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82 (D.D.C. 2008) (defendant allegedly issued "e-gold" which could be used as "an alternative payment system over the Internet" and would allow an e-gold account holder to "use the e-gold to buy a good or pay for a service, or to transfer funds to someone else") (quotation omitted).  These cases are distinguishable from the circumstances set forth in the Superseding Indictment, where AurumXchange was allegedly providing exchange services for customers who wished to exchange virtual currency for virtual or fiat currency, or fiat currency for virtual currency.

In short, prior to the issuance of the 2013 Guidance, the definition of "money transmitting service" did not clearly include those that transmit virtual currency and the 2013 Guidance, along with Director Calvery's statements on that Guidance, reflect an expansion of the scope of § 1960 in March 2013 to include virtual currency transmitters or exchangers like AurumXchange.  The Court finds that the 2013 Guidance coupled with the amendments to § 5330(d)(1)(A) to specifically include "value that substitutes for currency" indicates that an entity acting as a virtual

---

[6] When not apparent from the cited opinions that the activities underlying the indictments took place at least in part after the 2013 Guidance was issued, the Court has reviewed the relevant indictments and confirmed that they alleged conduct occurring after that time period.

currency exchange prior to 2013 was not subject to liability under § 1960 as a "money transmitting service."

### B.    Engaging As a Business In an Informal Money Transfer System

Mr. Pilipis could still have been subject to §§ 1960(b)(1)(B) and (C) if AurumXchange was considered an entity "who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institution system." 31 U.S.C. § 5330(d)(1) (eff. Oct. 26, 2001 to Dec. 31, 2020).  The statute leaves "informal money transfer system" and even just "transfer" or "money" undefined.  And while the Government argues that "[t]he movement of virtual currencies described in the superseding indictment falls under" this language, [Filing No. 92 at 9], the cases it relies upon for that statement and for its general proposition that § 1960 applied to AurumXchange are – as discussed above – distinguishable from this case in important ways.

For the same reasons that the Court has found that AurumXchange was not a "money transmitting service," the Court also finds that, based on the allegations in the Superseding Indictment, AurumXchange was not "engage[d] as a business in an informal money transfer system" or "in facilitating the transfer of money domestically or internationally outside of the conventional financial institution system" before the 2013 Guidance was issued.

### C.    Currency Exchange

Finally, AurumXchange could have been subject to § 1960 if it was a "money transmitting business" by virtue of "[p]rovid[ing]…currency exchange." 31 U.S.C. § 5330(d)(1) (eff. Oct. 26, 2001 to Dec. 31, 2020).  "Currency" is not defined in the statute, but 31 C.F.R. § 1010.100 provides

the following definition of "Currency" – which has remained unchanged from 2011, when it was first promulgated, to today:

> The coin and paper money of the United States or of any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issuance. Currency includes U.S. silver certificates, U.S. notes and Federal Reserve notes. Currency also includes official foreign bank notes that are customarily used and accepted as a medium of exchange in a foreign country.

31 C.F.R. § 1010.100(m). The plain language of this definition does not include virtual currency or cryptocurrency such as Bitcoin, which is not "coin" or "paper" money of the United States or any other country and is not – and certainly was not from 2009 to 2013 – "customarily used and accepted as a medium of exchange." For the same reasons that the Court has found that AurumXchange was not a "money transmitting service" and was not "engage[d] as a business in an informal money transfer system" or "in facilitating the transfer of money domestically or internationally outside of the conventional financial institution system," the Court similarly finds that AurumXchange was not providing "currency exchange" based on the allegations in the Superseding Indictment. Before the 2013 Guidance, exchanging virtual currency – as AurumXchange is alleged to have done – did not fall within "currency exchange" as used in § 5330(d)(1).

In sum, the Court funds that AurumXchange was not a "money transmitting business" subject to § 1960 because it was not a "money transmitting service," was not "engage[d] as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institution system," and did not provide "currency exchange" within the versions of 18 U.S.C. § 1960 and 31 U.S.C. § 5330(d)(1)(A) that were in effect when the events underlying the Superseding Indictment occurred and prior to FinCEN's clarification in the 2013 Guidance.

Section 5330(a)(1) requires that a money transmitting business register within 180 days of the date the statute was enacted or the date on which the business was established, whichever is later. Given the Court's finding that the 2013 Guidance brought AurumXchange within the scope of § 5330, the Court further finds that AurumXchange was required to register within 180 days of the date the 2013 Guidance was issued, or by September 14, 2013.

There is uncertainty, however, regarding exactly when AurumXchange ceased operations. Mr. Pilipis asserts that AurumXchange ceased operations in May or June of 2013, so did not violate any registration requirements. [Filing No. 80 at 4.] The Government argues that "[e]ven assuming arguendo [Mr. Pilipis's] argument has merit, the superseding indictment alleges that [he] operated AurumXchange as late as 2013, so at a minimum, there would be a factual dispute as to whether [he] operated the unlicensed money transmitting business after [certain regulatory guidelines] took effect." [Filing No. 92 at 15 n.18.]

The Court **GRANTS** Mr. Pilipis's Motion to Dismiss, [Filing No. 77], as to any portions of Counts 1 through 5 that are based on specified unlawful conduct – violations of § 1960 – that took place before September 14, 2013. In order for the Court to determine whether any portions of Counts 1 through 5 remain – *i.e.*, whether AurumXchange operated after the September 14, 2013 registration deadline – the Court **SETS** a hearing for **February 27, 2025** at **10:00 a.m.** at which the parties will each have **20 minutes** to address the Court regarding that issue. The parties should also be prepared to address the effect of the Court's ruling on the Government's Application for Post-Indictment Restraining Order and on the status of the Civil Forfeiture Case.

## IV.
### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Mr. Pilipis's Motion to Dismiss Counts 1-5 of the [Superseding] Indictment, [77], as to any portions of Counts 1 through 5 that are based on

specified unlawful conduct – violations of § 1960 – that took place before September 14, 2013. The Court **SETS** a hearing for **February 27, 2025** at **10:00 a.m.** in **Room 202**, United States Courthouse, 46 E. Ohio Street, Indianapolis, IN 46204.  The parties shall be prepared to address the issues described above.

Date: 2/13/2025

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**